## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT JEFFERS,** | : | **CIVIL ACTION NO. 1:22-CV-1815** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **TROOPER E. KISER and** | : | |
| **TROOPER WATSON,** | : | |
| | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

This civil rights action arises out of a Pennsylvania State Police traffic stop on Interstate 83 ("I-83"). Plaintiff Robert Jeffers, an adult African American male, asserts that the stop itself and the subsequent conduct of Pennsylvania State Trooper Edward L. Kiser—who physically removed Jeffers from his vehicle—were animated by racial bias. He also claims that Trooper Mikhail Watson committed battery and used excessive force when he struck Jeffers several times while Trooper Kiser was wrestling Jeffers to the ground. Finally, Jeffers contends that Trooper Kiser failed to intervene when Trooper Watson used excessive force. He seeks relief pursuant to Pennsylvania tort law, as well as the Fourth and Fourteenth Amendments of the United States Constitution *via* 42 U.S.C. § 1983. Troopers Kiser and Watson (collectively, "defendants") now move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). We will grant defendants' motion in its entirety.

## I. __Factual Background & Procedural History__[1]

In the late afternoon hours of December 31, 2021, Jeffers was driving northbound on I-83 with three of his daughters, aged five, nine, and twelve. (See Doc. 34 ¶ 3; Doc. 34-4 at ECF 7; Doc. 38-1 ¶ 5). Trooper Kiser saw Jeffers' Chevy Silverado pickup truck traveling at a high rate of speed—approximately 72 miles per hour in a 55-mile-per-hour zone—in the right lane, and he noted that Jeffers did not move over to the open left lane when he passed another trooper who was conducting a traffic stop on the right shoulder. (See Doc. 34 ¶ 3; Doc. 38-1 ¶¶ 3-4). Trooper Kiser activated his emergency lights moments later as Jeffers approached the Leader Heights exit. (See 12/31/21 Rec. 01:22-01:29; Doc. 34 ¶ 3 (citing Doc. 34-4 at 4); Doc. 38-1 ¶ 5).

Jeffers did not stop immediately when he saw Trooper Kiser's emergency lights; he proceeded part of the way up the off-ramp and stopped behind several cars and a tractor trailer that were idling at a red light. (See Doc. 34 ¶ 5; Doc. 38-1 ¶ 5; 12/31/21 Rec. 01:29-01:55). Trooper Kiser parked his vehicle and approached

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 34, 38-1). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts. We supplement those citations where applicable with facts derived from the dashcam footage of Jeffers' stop. (See Doc. 34-5, Ex. D, 12/31/21 Rec.).

the driver's side of Jeffers' truck with his right hand resting on his service weapon. (See 12/31/21 Rec. 01:55-02:12).  As Trooper Kiser neared Jeffers' door, Jeffers rolled down his window and initiated the following exchange, which we reproduce in full below to provide a complete picture of how the event escalated:

| | |
|---|---|
| JEFFERS: | You can pull me over right over there -- |
| TROOPER KISER: | I'm just wondering why you're not stopping. |
| JEFFERS: | Bro I-- [inaudible] |
| TROOPER KISER: | There was room to stop back there. |
| JEFFERS: | No, no. |
| TROOPER KISER: | No, there was room to stop back there.  We'll stop there [*points*], I'll follow you.  You find a good place and we'll get out, okay? |
| JEFFERS: | Get out for what? |
| TROOPER KISER: | I'm gonna get you out. |
| JEFFERS: | No, you not. |
| TROOPER KISER: | You gave me a hard time. You're not gonna get out of the truck? |
| JEFFERS: | No, I'm not gonna stop right there on the road.  No, I got my kids in here. |
| TROOPER KISER: | Just get out of the car right now. |
| JEFFERS: | No, no—my kids are right here. |

> TROOPER KISER:          Sir, get out of the truck.  I'm
> telling you right now.  [*opens
> door*] C'mon.  Get out of the
> truck.

(See 12/31/21 Rec. 02:07-02:37).[2]

After Trooper Kiser opened the driver's side door, Jeffers yelled, "Don't

f***ing touch me!  This is wrong!" and repositioned his body toward the middle of

the cab to avoid being Trooper Kiser's reach.  (See id. at 02:37-02:40).  Trooper

Kiser radioed for backup and continued instructing Jeffers to get out of the vehicle.

(See id. at 02:40-02:46).  He also instructed Jeffers to stop reaching into the

backseat, though Jeffers claimed to be attending to his kids.  (See id. at 02:43-02:50).

Jeffers resisted Trooper Kiser's efforts to pull him out of the vehicle before

ultimately acquiescing.  (See id. at 02:48-03:06).  After Jeffers exited the truck,

Trooper Kiser instructed him to turn around, face the vehicle, and place his hands

behind his back.  (See id. at 03:06-03:22).  Jeffers again resisted; he turned to face

the trooper and put his hands up in a defensive posture while still holding onto his

phone.  (See id.).  Trooper Kiser then grabbed Jeffers by his left leg and pulled up,

causing Jeffers to lose his balance and fall to the ground.  (See id. at 03:22-03:30).  In

total, Jeffers refused Trooper Kiser's orders to place his hands behind his back

seven times in the span of approximately thirty seconds.  (See id. at 03:09-03:41).

---

[2] We acknowledge that the foregoing transcription does not perfectly capture
the exchange between Jeffers and Trooper Kiser.  It is only an excerpt, the
microphone picks up more of Trooper Kiser's voice than Jeffers', there is ambient
noise, and the men talk over one another.  Though some portions of the video are
difficult to recreate *verbatim*, what we provide here is clearly audible, largely
complete, and, for all practical purposes, not subject to reasonable dispute.

The two men continued to struggle on the roadway between Jeffers' truck and the left guardrail. (See id. at 03:36-03:41). Jeffers pleaded with Trooper Kiser to stop, but he did not cooperate at all in Trooper Kiser's efforts to place him in handcuffs. (See id. at 03:36-03:43). While kneeling on the ground with his back to Trooper Kiser, Jeffers appears to make a phone call with his right hand. (See id.) He then raised both arms while pleading with Trooper Kiser not to hit him; the trooper promptly attached a cuff to Jeffers' left wrist. (See id. at 03:36-03:46). Jeffers then attempted to stand up, causing Trooper Kiser to fall forward onto Jeffers. (See id. at 03:45-03:48).

The fray is out of frame briefly as the two men regain their balance, (see id. at 03:55-03:56), but it returns moments later when Trooper Watson arrives and leaps into the scuffle, colliding with Jeffers' lower body. (See id. at 03:56-03:58). Trooper Watson punched Jeffers twice in the hamstring area, (see id. at 04:02-04:09; see also Doc. 38-1 ¶ 44; Doc. 39 at 4), at which point Jeffers capitulated and Trooper Kiser handcuffed him, (see id. at 04:10-04:16). Jeffers continued to verbally protest his treatment while in handcuffs, indicating that he had acted in the best interests of his children. (See id. at 04:16-04:31). He spent New Years' Eve in jail and was charged with, *inter alia*, failure to move over for an emergency vehicle. (See Doc. 38-1 ¶ 21). Jeffers pled guilty to that offense and to a charge of disorderly conduct on May 26, 2022. See Commonwealth v. Jeffers, No. CP-67-CR-0000409-2022, at 4.[3]

_____

[3] At his deposition, Jeffers recalled that the only conviction resulting from the stop on December 31, 2021, was for "[n]ot moving out of the way of an emergency vehicle, called an M 3." (See Doc. 34-6, Ex. E, Jeffers Dep. at 28:12-19). He denied pleading guilty to a charge of disorderly conduct. (See id. at 28:20-24; see also Doc.

Jeffers initiated this lawsuit in November 2022.  He subsequently filed an amended complaint in which he raises four claims: excessive force (Count I) and common-law battery (Count IV) against Trooper Watson, as well as failure to intervene (Count II) and denial of equal protection (Count III) against Trooper Kiser.  (See Doc. 19 ¶¶ 28-58).  The troopers move for summary judgment on all claims.  The motion is fully briefed and ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

---

38-1 ¶ 21).  Though we take judicial notice, see FED. R. EVID. 201(b)(2), of the York County Court of Common Pleas' docket—which reveals that Jeffers entered a plea of guilty to *both* a moving violation and one count of disorderly conduct—we ultimately find that resolution of this apparent confusion does not alter our analysis, see *infra* Part III.A.1-2.

574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.

See Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Trooper Watson asserts that his use of force was reasonable in light of the circumstances, and that he is entitled to sovereign immunity with respect to the state law battery claim because he used force in the context of effectuating an arrest.  Trooper Kiser asserts that Jeffers has not adduced evidence sufficient to sustain a judgment in his favor on charges of selective enforcement or failure to intervene.  We agree in all respects.  Our analysis of the claims arising under Section 1983 proceeds in accordance with the sequence of events as they occurred on December 31, 2021.  We then turn to the lone state claim against Trooper Watson.

### A.   **Federal Claims – Section 1983**

Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights but serves as a mechanism for vindicating rights otherwise protected by federal law.  See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Qualified immunity, however, shields a state actor who commits a constitutional violation if the right in question was not "clearly established" at the time of the relevant conduct.  See Pearson v. Callahan,

555 U.S. 223, 231-32 (2009).  In other words, a state actor who reasonably believed that their conduct complied with settled law enjoys immunity from suit, and the doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted); Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  A defendant claiming qualified immunity bears the burden of demonstrating its applicability.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2011) (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989)).  Courts are then tasked with considering: (1) whether, based on the facts, a constitutional right has been violated, and (2) if so, whether the right was "clearly established" at the time of the alleged violation. See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).

### 1.    *Count III – Selective Enforcement (Trooper Kiser)*

Jeffers claims that Trooper Kiser violated his Fourteenth Amendment rights during the traffic stop by "physically and emotionally abus[ing]" him because of his "status as a Black person."  (See Doc. 19 ¶ 48).  He asserts that Kiser does not subject white people to similar force or scrutiny.  (See id. ¶¶ 50-51).  Jeffers advances a theory of racial discrimination predicated upon selective enforcement,[4] but he has not offered

---

[4] Jeffers frames his Fourteenth Amendment claim in the broadest possible terms in his amended complaint, (see Doc. 19 ¶ 48; id. ¶ 53 ("Kiser violated Mr. Jeffers['] rights under the [E]qual [P]rotection [C]lause")), but his brief in opposition makes clear that his claim is limited to selective enforcement, (see Doc. 38 at 8 (citing, *inter alia*, Whren v. United States, 517 U.S. 806, 813 (1996); Crawford-El v. Britton, 523 U.S. 574, 600 (1988)).  Accordingly, we will disregard Jeffers' invocations of Fourth Amendment seizure standards, (see Doc. 38 at 8-9), when resolving his equal protection claim.

evidence from which a jury could reasonably conclude that Trooper Kiser subjected him to disparate treatment. His claim therefore fails as a matter of law.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Broadly, the Clause guarantees that government officials will treat individuals fairly and equally. See Christopher v. Nestlerode, 373 F. Supp. 2d 503, 519 (M.D. Pa. 2005) (Conner, J.) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 239-42 (1976)). Relevant to Jeffers' claim, it "prohibits selective enforcement of the law based on considerations such as race." Thomas v. Independence Township, 463 F.3d 285, 297 (3d Cir. 2006) (quoting Whren, 517 U.S. at 813). A plaintiff who cannot offer direct evidence of discriminatory animus may nonetheless prevail by demonstrating: "(1) that he was treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an unjustifiable standard, such as race [or] religion." Dombrosky v. Stewart, 555 F. App'x 195, 197 (3d Cir. 2014) (citing Dique v. N.J. State Police, 603 F.3d 181, 184 n.5 (3d Cir. 2010)).

We read Jeffers' version of events to implicate two distinct starting points for the selective enforcement analysis. He argues that Trooper Kiser initiated a stop not because Jeffers had violated any traffic laws, but because he was suspicious of "an African-American man driving an expensive vehicle." (See Doc. 38 at 12). Separately, he claims that Trooper Kiser "does not subject White people . . . to be[ing] ripped out of their vehicles and face-planted in front of their children for

minor traffic violations." (See Doc. 19 ¶ 51). Neither contention forms the basis for a Fourteenth Amendment claim, because Jeffers has not adduced evidence of disparate treatment.

In challenging Trooper Kiser's decision to initiate a stop, Jeffers depends upon bald assertions that the trooper held beliefs consistent with stereotypes about African Americans. Such claims alone are insufficient. Jeffers argues, for instance, that his wearing a hoodie "increas[ed]" Trooper Kiser's "desire to pull him over," and that Trooper Kiser began scrutinizing Jeffers because he was driving an expensive car. (See Doc. 38-1 ¶ 27; Doc. 38 at 12). But a disparate treatment claim requires evidence that individuals who are "similar … in *all* relevant respects" were treated differently, see Dombrowsky, 555 F. App'x at 197 (emphasis added), and Jeffers leaves out a pivotal fact. Jeffers acknowledges that he was charged with and pled guilty to failing to move out of the way of an emergency vehicle, (see Jeffers Dep. at 27:24-28:24; Doc. 38-1 ¶ 21). Accordingly, a "similarly situated individual" for purposes of this claim is not simply a non-Black person driving an expensive car and wearing a hoodie, but a non-Black person driving an expensive car and wearing a hoodie who commits a moving violation. Jeffers presents nothing to substantiate the notion that Trooper Kiser ignores traffic violations committed by drivers of other races, and we cannot conclude that a reasonable jury would find such grounds for a selective enforcement claim on the record before us.

To the extent Jeffers seeks relief for Trooper Kiser's supposed inflexible demeanor or harsh demands during the stop—as distinct from the decision to pull him over in the first place—the video evidence undermines his alternative theory.

Trooper Kiser clearly accedes to Jeffers' request to relocate to an area Jeffers considers to be safer.  (See 12/31/21 Rec. 02:17-02:22).  It is only when Trooper Kiser informs Jeffers that he will have get out of the vehicle that Jeffers unequivocally refuses to comply.  (See id. at 02:23-02:25).  He then reiterates his refusal several times.  (See id. at 02:25-02:31).

It is well-settled that a police officer may order a driver to exit their vehicle during a lawful traffic stop.  See United States v. Moorefield, 111 F.3d 10, 12-13 (3d Cir. 1997) (citing Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam); Maryland v. Wilson, 519 U.S. 408 (1997)).  Our review of the video evidence reveals that Trooper Kiser's alleged inflexibility, (see Doc. 38-1 ¶¶ 6, 9), flowed from Jeffers' refusals to comply with a lawful order, (see 12/31/21 Rec. 02:07-02:48).  In other words, while Jeffers asks us to compare Trooper Kiser's conduct in this instance to his treatment of non-Black drivers who commit "minor traffic violations," (see Doc. 19 ¶ 51), we must again ensure that the group of similarly situated individuals is "similar … in all relevant respects," see Dombrowsky, 555 F. App'x at 197 (emphasis added).  Committing a traffic violation, (see Jeffers Dep. at 27:24-28:24), is surely one relevant factor in constituting that group, but refusing to follow a resulting lawful order or series of orders is undoubtedly another.  The record contains no evidence with respect to Trooper Kiser's treatment of other non-Black drivers who, after being stopped for traffic violations, refuse to comply with his valid instructions.  Neither evidence of an unrelated accusation of racial animus nor evidence of irregularities in Trooper Kiser's reporting of the incident compensates

11

for this fundamental flaw in Jeffers' argument.[5]  Without anything to substantiate the notion that he is more lenient with uncooperative drivers at traffic stops if they are not Black, Trooper Kiser is entitled to judgment as a matter of law on Jeffers' selective enforcement claim.

### 2.  *Count I – Excessive Force (Trooper Watson)*

It is well-established that making a lawful arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).  "Not every push or shove" rises to the level of a Fourth Amendment violation.  See id. (citation omitted); see also Tennessee v. Garner, 471 U.S. 1, 5 (1985) (Fourth Amendment serves as touchstone for use of force in effectuating arrest).  Force may not be used at all, however, against an individual "who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant."  See Anthony v. Seltzer, 696 F. App'x 79, 82-83 (3d Cir. 2017) (nonprecedential) (collecting cases); see also Lamont v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011). The doctrine of qualified immunity protects even those actions in the sometimes "hazy border" between acceptable and excessive force.  See Mullenix v. Luna, 577 U.S. 7, 18 (2015) (*per curiam*) (citation omitted).

---

[5] Citing Trooper Kiser's own testimony, Jeffers observes that the trooper has been the subject of a racial profiling complaint in the past.  (See Doc. 38 at 13; Doc. 38-3, Ex. A, Kiser Dep. at 40:19-41:25).  He also points out that Trooper Kiser's affidavit of probable cause does not mention his supposedly high rate of speed, the fact that he received no summons for that infraction, or the fact that Trooper Kiser failed to mention Trooper Watson at all in his incident report, let alone Trooper Watson's use of force to subdue Jeffers.  (See Doc. 38 at 13; see also Doc. 19 ¶ 52).

In evaluating a claim of excessive force, courts determine "whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test." Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015) (citing Graham, 490 U.S. at 395). We prioritize the "perspective of a reasonable officer on the scene" and cannot rely upon "the 20/20 vision of hindsight." See Graham, 490 U.S. at 396-97 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). This standard cannot be applied "mechanical[ly]," and it must be informed by careful attention to the facts at issue. See id. at 396. We need not accept Jeffers' or Trooper Watson's versions of events to the extent they depend on circumstances blatantly contradicted by the record; instead, we view the encounter "in the light depicted by the videotape." See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (citing, *inter alia* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)); see also Jacobs v. Cumberland County, 8 F.4th 187, 192 (3d Cir. 2021) (quoting Scott, 550 U.S. at 378, 380).

The United States Supreme Court has provided three factors to guide our analysis: "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene." Santini, 795 F.3d at 417 (citing Graham, 490 U.S. at 396). Our court of appeals has further instructed that additional relevant factors include: the possibility of a suspect being armed, the duration of the encounter, whether the force is wielded in the context of effecting an arrest, and how many people an officer must contend with simultaneously. See id. (citing Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other

grounds by <u>Curley v. Klem</u>, 499 F.3d 199 (3d Cir. 2007)).  This inquiry is "dipositive"—that is, a reasonable seizure cannot serve as the basis for an excessive force claim.  See <u>County of Los Angeles v. Mendez</u>, 581 U.S. 420, 428 (2017).

Having scrutinized the video, and considering the totality of the circumstances, we conclude that Trooper Watson's brief use of force in the form of two compliance punches to Jeffers' leg was reasonable under the circumstances. Jeffers makes passing attempts to shift our focus to the reasonableness of *Trooper Kiser*'s decision to pull him over in the first place, (see, e.g., Doc. 19 ¶¶ 32-33; Doc. 38 at 17), but his claim requires us to assess the encounter from Trooper Watson's perspective, see <u>Graham</u>, 490 U.S. at 396-97.  From that vantage, four factors weigh heavily against Jeffers' claim.  First, it is undisputed that Trooper Watson used force in the context of assisting Trooper Kiser to effect an arrest.  (See Doc. 38-1 ¶¶ 41, 45).  Second, Trooper Watson saw a suspect resisting another officer and ignoring verbal orders.  (See Doc. 34-3, Ex. B, Watson Dep. at 17:1-15).  Third, the situation had been escalating for at least a full minute since Trooper Kiser called for backup.  (See 12/31/21 Rec. 02:42-03:58).  Finally, a continuing struggle on a raised highway off-ramp with traffic circulating nearby posed a serious risk to the safety of both the officers and others, including Jeffers' children.  Cf. <u>Williams v. Sandel</u>, 433 F. App'x 353, 361 (6th Cir. 2011) (nonprecedential) (recognizing "inherent" safety risk posed by individual resisting arrest "alongside traffic moving at high speeds," even when encounter takes place outside flow of traffic).

One factor is ambiguous.  Trooper Watson could not have known what had caused the interaction between Jeffers and Trooper Kiser to escalate, whether it

was a dispute over a moving violation or a physical altercation. Three factors weigh slightly in Jeffers' favor, but none shifts the balance. Jeffers never threw a punch, and he did not appear to be violent or to pose a physical threat; in fact, he called out as Trooper Watson approached that he was just trying to contact his wife, which would explain his persistent efforts to use his phone. (See 12/31/21 Rec. 03:47-03:55). Additionally, Troopers Kiser and Watson outnumbered Jeffers, and there was no indication that Jeffers was armed. For these reasons, a reasonable factfinder might find that this case occupies the "hazy border" between acceptable and excessive force recognized in Mullenix, see 577 U.S. at 18. In that gray area, we reiterate, qualified immunity applies. See id.

Broadly, the court must balance "the nature and quality of the intrusion" on Jeffers' Fourth Amendment rights against "the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks and citation omitted). We cannot say that the collision and two punches to non-vital areas of the body amount to an intolerable intrusion considering the priorities of a law enforcement officer arriving to support his colleague in a dynamic and hazardous situation. Nothing in the video corroborates Jeffers' unrefreshed recollection that Trooper Watson "field goal punted [him] in the ribs three times," "dropped his knee down into [Jeffers] three times," and "repeatedly punched [him] in the hip while [he] was down on the ground with [his] hands behind [his] back." (See Jeffers Dep. at 16:4-11, 24:5-25). To the contrary, Trooper Watson leapt into the fray while Trooper Kiser was trying to bring Jeffers to his feet. When Trooper Watson's lower body made contact with Jeffers, his right leg rose off the ground, but there was no

kick (let alone three kicks and three knee drops); the single leg motion plainly resulted from the awkward manner in which Trooper Watson fell. (See 12/31/21 Rec. 03:54-03:56).  With Trooper Kiser straddling him, Jeffers partially rolled over onto his stomach but refused to relinquish his hands; at that point, Trooper Watson punched Jeffers' right leg twice to get him to release his hands from beneath his body, thereby allowing Trooper Kiser to administer handcuffs. (See id. at 03:56-04:09).  From Trooper Watson's perspective, the sight of an individual resisting arrest and refusing to comply with a fellow officer's instructions rendered the force he employed tolerable to the Constitution.

### 3.     *Count II – Failure to Intervene (Trooper Kiser)*

Our court of appeals has recognized that law enforcement officers are directly liable under Section 1983 if they "fail[] or refuse[] to intervene when a constitutional violation . . . takes place in [their] presence." See Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)).  Jeffers claims that Trooper Kiser failed to intervene to prevent Trooper Watson from using excessive force.  We have concluded that Trooper Watson's actions did not amount to a constitutional violation, and so this claim must also fail. See Bryant v. City of Philadelphia, 518 F. App'x 89, 93 (3d Cir. 2013) (*per curiam*) (citing Smith, 293 F.3d at 650-51).

### B.     **State Claim – Battery**

Lastly, Jeffers claims that Trooper Watson's compliance strikes constitute common law battery.  As our court of appeals has recognized, however, "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest," a privilege

that may be negated by a finding of excessive force.  See Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) (citing Edwards v. City of Philadelphia, 860 F.2d 568, 572 (3d Cir. 1988)).  Because we find that Trooper Watson did not use excessive force, the strikes he landed on Jeffers to gain compliance are privileged, and Trooper Watson is entitled to both sovereign immunity and summary judgment on this claim.

## IV.  **Conclusion**

We will grant defendants' motion (Doc. 33) for summary judgment *in toto*.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    July 3, 2024